FILED

2009 Feb-06  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **ERIC W. DRAKE, SR., AND** | ) |
| **EMMA DRAKE,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.:  5:07-CV-707-VEH** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs Eric W. Drake, Sr. ("Mr. Drake") and his wife, Emma Drake ("Mrs. Drake"), bring this medical malpractice case against Defendant United States of America (the "Government") pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*  (*See generally* Doc. 1).   In their complaint, Plaintiffs maintain that the inadequate medical services provided by the VA Outpatient Clinic in Huntsville ("VAOPC Huntsville") and/or the Birmingham Veterans Affairs Medical Center ("VAMC Birmingham"), including the failure "to timely recognize and treat the signs and symptoms of Mr. Drake's cauda equina syndrome ["CES"]" caused him to become paralyzed and suffer from additional injuries.  (Doc. 1 ¶¶ 4, 20,

22.a)).

Plaintiffs' lawsuit, filed on April 20, 2007, contains two counts.   Count One is for medical negligence and is asserted by Mr. Drake.  (*Id.* ¶¶ 21-25).  Count Two is for loss of consortium and is brought by Mrs. Drake.  (*Id.* ¶¶ 26-29).

Pending before the court is the Government's Motion for Summary Judgment (Doc. 47) filed on November 3, 2008.  Also filed on November 3, 2008, were the Government's supporting brief (Doc. 48) and its motion to update its previously filed evidentiary materials (Doc. 49), which the court margin granted on November 4, 2008.

Plaintiffs filed their brief and other materials in opposition to summary judgment on November 24, 2009.  (Docs. 54-58).  The Government filed its reply brief and supplemental evidentiary materials (Docs. 59-60) on December 2, 2008. This reply also incorporated within it a Motion to Exclude a Part of Plaintiffs' Expert Evidence (the "Motion to Exclude").

On December 10, 2008, Plaintiffs filed a response to the Government's reply brief and Motion to Exclude. (Doc. 62).  On that same date, Plaintiffs also filed supplemental evidentiary materials.  (Docs. 63-66).

The Government's Motion for Summary Judgment is premised upon the insufficiency of Plaintiffs' expert testimony offered in support of their claims.

Therefore, the relief sought in the motion is really twofold, *i.e.*, it seeks both the exclusion of expert evidence as well as judgment as a matter of law. (*See, e.g.*, Doc. 54 at 23 ("Defendant has moved to exclude plaintiffs' expert witnesses. Defendant seeks dispositive summary judgment on the basis that expert testimony required to support plaintiffs' claims fails to comport with competency requirements of Alabama substantive law[.]")).

Having thoroughly reviewed the record and considered the parties' arguments, the Government's Motion to Exclude (relating to timeliness under Rule 26) is **DENIED** and its Motion for Summary Judgment is also **DENIED**.

## II.  STANDARDS, GOVERNING LAW, AND BURDENS

### A.  Summary Judgment

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). "The substantive law applicable to the case determines which facts are material." *Fitzpatrick*, 2 F.3d at 1115 (citation omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.    Medical Malpractice Claims Under FTCA

"Congress has authorized a limited waiver of sovereign immunity under the

FTCA[:]"

> [F]or injury or loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any employee of the
> Government while acting within the scope of his office or employment,
> under circumstances where the United States, if a private person, would
> be liable to the claimant in accordance with the law of the place where
> the act or omission occurred.

*See, e.g., Means v. U.S.*, 176 F.3d 1376, 1378-79 (11th Cir. 1999) (citing 28 U.S.C.

§ 1346(b)) (other citations omitted).

Accordingly, because the alleged acts or omissions that purportedly caused

Plaintiffs' injuries in this case all occurred in Alabama (Doc. 1 ¶ 2 ("The acts and

omissions herein complained of occurred in the State of Alabama during 2006")),

Alabama law governs the substantive scope of this case, except to the extent a

particular area or issue has been displaced or modified by the application of federal

law.  *See, e.g., Hoyt v. U.S.*, 286 F.2d 356, 358 (5th Cir. 1961) ("[T]he general theory

of the [FTCA] is that the outcome of each case is to be determined in accordance with

the law of the state where the death [or other injury] occurred.");[1] 28 U.S.C. § 2674

---

[1]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc), the Eleventh Circuit adopted as binding precedent all decisions of the former
Fifth Circuit handed down prior to October 1, 1981.

("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.") (emphasis added); *Hoyt*, 286 F.2d at 357-58 (discussing 1947 amendment to FTCA designed to remedy inequitable situations caused by punitive damages proviso's application to wrongful death cases arising in Alabama and Massachusetts because the only damages recoverable in those jurisdictions are punitive in nature).

### C.   Medical Malpractice Claims Under Alabama Law

With regard to a plaintiff's burden of proof in medical malpractice actions, § 6-5-548 of the Alabama Medical Liability Act ("AMLA") provides that:

> Plaintiff shall have the burden of proving by substantial evidence that the healthcare provider failed to exercise such reasonable care, skill and diligence as other similarly situated healthcare providers in the same general line of practice ordinarily have and exercise in a like case.

Ala. Code § 6-5-548(a).  Normally this burden requires a plaintiff to produce expert medical testimony to establish a breach of the standard of care.[2]

More specifically, a plaintiff must typically introduce the testimony of a

---

[2]  However, there are exceptions to this requirement.  For example, application of *res ipsa loquitur* is such an exception, but that doctrine is not presented as an issue here.  *See, e.g., Ex parte HealthSouth Corp.*, 851 So. 2d 33, 39, 40, 42 (Ala. 2002) (discussing scope of exception to requirement that plaintiff produce expert testimony when "layperson would have common knowledge sufficient to understand whether the standard of care has been breached").

medical expert witness to establish (1) the appropriate standard of care, (2) that the

defendant breached the standard of care, and (3) that the breach proximately caused

the plaintiff's injuries.  *See, e.g., University of Alabama Health Services Foundation,*

*P.C. v. Bush*, 638 So. 2d 794, 798 (Ala. 1994) ("In a medical malpractice case, the

plaintiff must prove by expert testimony that the physician breached the standard of

care and by the breach proximately caused the plaintiff's injury.") (citations omitted).

### D.    Challenges to Expert Testimony Under Rule 702

Rule 702 of the Federal Rules of Evidence allows expert testimony when (1)

the witness is qualified as an expert; and (2) his expertise "will assist the trier of fact

to understand the evidence or to determine a fact in issue . . . ."  Fed. R. Evid. 702.

More specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts of
> the case.

Fed. R. Evid 702.  Rule 702 must be read in conjunction with three seminal decisions

by the Supreme Court of the United States related to expert testimony.  *See Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v.*

*Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The *Daubert* decision rejected the previously followed "general acceptance" standard on the admissibility of scientific expert testimony that was established pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), *superseded by rule as stated in Daubert*, 509 U.S. at 587 ("They contend that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence. We agree.") (footnote omitted). Instead, the *Daubert* Court addressed admissibility of scientific expert testimony within the framework of Rule 702 and emphasized the role of the district court to perform a gatekeeping function to ensure that <u>any admitted expert testimony is both relevant and reliable</u>.

> In defining the district court's gatekeeping role, the Supreme Court stated:
>
> [T]he trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592-93.

In *Joiner*, the United States Supreme Court upheld a district court's decision granting summary judgment for the defendant on the basis that the plaintiff's experts' testimony connecting plaintiff's cancer to his exposure to PCBs and other chemicals

did not rise above the level of subjective belief and speculation.  In clarifying the sufficiently relevant and reliable standard announced in *Daubert*, the *Joiner* Court pointed out that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (citation omitted).

The *Kumho Tire* decision extended the *Daubert* analysis to all types of "technical and other specialized knowledge . . . ." *Kumho Tire*, 526 U.S. at 141. ("We conclude that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.")  *Kumho Tire* involved the admissibility of the proffered testimony of an engineer, who was an expert in tire failure analysis.  In upholding the district court's decision to exclude the plaintiff's expert's testimony based upon lack of reliability, the Supreme Court noted that the relevant inquiry was whether the expert could reliably determine the cause of the specific tire's separation. *Kumho Tire*, 526 U.S. at 154.

The Eleventh Circuit has described the district court's mandatory *Daubert* role

as:

> [E]ngag[ing] in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (citation omitted).

"District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* at 1291 (citation omitted).

Additionally, all rulings on expert testimony motions are reviewed under an abuse of discretion standard. *See, e.g., Joiner*, 522 U.S. at 141 ("All evidentiary decisions are reviewed under an abuse-of-discretion standard."). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 Fed. Appx. 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Concerning the issue of whether to hold a *Daubert* hearing, the Eleventh Circuit has explained:

In this case, after the government moved to exclude Tressel's testimony,

the district court assessed the reliability of his opinions by conducting a thorough *Daubert* hearing in which Tressel was asked, repeatedly, what the bases for his opinions were. While some expert testimony will be so clearly admissible that a district court need not conduct a *Daubert* hearing in every case, *see Kumho Tire*, 526 U.S. at 150-52, 119 S. Ct. at 1175-76, in this case, the district court's decision to evaluate the admissibility of Tressel's opinions in the context of a pre-trial hearing was a perfectly reasonable one. Moreover, Frazier has not attacked the timing or conduct of the *Daubert* hearing. And the record amply establishes that Frazier was afforded every opportunity at the hearing to adduce the foundations of Tressel's challenged opinions. The district court did not abuse its discretion when it conducted a *Daubert* hearing.

*United States v. Frazier*, 387 F.3d 1244, 1264 (11th Cir. 2004). Relatedly, the Eleventh Circuit "also review[s] a trial court's decision on whether to hold a *Daubert* hearing for abuse of discretion." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe* 402 F.3d 1092, 1113 (11th Cir. 2005).[3]

Finally, <u>the burden under Rule 702 rests squarely with the proponents of the expert witness</u> who, in this case, are the Plaintiffs:

The proponent of the expert testimony carries a substantial burden under Rule 702. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999) (citing *Daubert*, 509 U.S. at 592 n.10, 113 S. Ct. 2786). <u>Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact</u>. *See, e.g., Frazier*, 387 F.3d at 1260 ("The burden of establishing qualification, reliability, and

---

[3]  No party has requested a *Daubert* hearing.

helpfulness rests on the proponent of the expert opinion . . . ."); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002); *Maiz*, 253 F.3d at 664.

*See Cook ex rel. Estate of Tessier v. Sheriff of Monroe*, 402 F.3d 1092, 1107 (11th Cir. 2005) (emphasis added).

## III.   STATEMENT OF FACTS[4]

### A.   Background Facts[5]

Mr. Drake suffered from a severe disc herniation at the L5-S1 region on January 25, 2006, and went to see Dr. Ortega, an internist, about his condition.  Dr. Ortega found signs of bilateral lumbosacral radiculopathy.   An MRI study was performed on Mr. Drake on January 26, 2006, with a report generating on January 27, 2006.

Dr. Ortega was aware that Mr. Drake was developing numbness in the saddle region, which Plaintiffs contend is an indication that a patient is experiencing the

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Accordingly, these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[5] Many of these background facts are taken directly from the introductory section of Plaintiffs' opposition brief.  (Doc. 54 at 22-23).

onset of cauda equina syndrome ("CES").  CES is an emergent condition in which the spinal roots are compressed by the herniated disc.

Dr. Ortega then contacted Dr. Cho, a neurosurgery resident, for a consultation. Dr. Cho did not arrange for a clinic neurosurgery consultation appointment for Mr. Drake.  On February 2, 2006, Mr. Drake was finally advised to seek a surgical evaluation at a local emergency room.

### B.    Statement of  Facts Material to Summary Judgment

At the time when Mr. Drake sought medical treatment, Dr. Cho was a neurosurgical resident practicing in spine surgery.[6]

Mr. Drake presented with CES symptoms on January 31, 2006.  Mr. Drake was not advised to seek a surgical evaluation until February 2, 2006.

The parties do not dispute the substance of Plaintiffs' experts' opinions. Instead, their disagreement is over the caliber of that testimony and whether the expert evidence is of an admissible quality under Rule 702 and *Daubert*.  To the extent that other facts are material to the court's ruling on summary judgment, they are addressed later in the opinion.

---

[6]  Dr. Cho <u>later</u> became a neurologist certified by the American Board of Neurological Surgery.

## IV.   ANALYSIS

### A.   Motion to Exclude

The Government's Motion to Exclude contains two parts.  The first section challenges the affidavits offered in opposition to summary judgment by Plaintiffs' previously disclosed experts (*i.e.*, Drs. Van Dam, Ludwig, Bolster, and Adams).  The second portion attacks Plaintiffs' five affidavits from medical professionals that were not previously disclosed to the Government (*i.e.*, Drs. Keiller, Bingaman, Tautuwaya, Ward, and Lanman).  The Government relies upon Rules 26 and 37 of the Federal Rules of Civil Procedure to support its motion.  In this court's view, the Government has not effectively shown how Plaintiffs have run afoul of the Federal Rules of Civil Procedure under the particular circumstances of this case.

### 1.   Affidavits by Plaintiffs' Previously Disclosed Experts

The Government argues that Rules 26 and 37 apply to the supplementary affidavits provided by Plaintiffs' previously disclosed experts in opposition to summary judgment.  More specifically, the Government urges that because any amendments with respect to expert testimony are untimely because they were not provided within thirty days of the expert depositions, and therefore they are due to be excluded.  (Doc. 59 at 3).

However, the Government fails to show how Plaintiffs have specifically

violated Rule 26, which it maintains supports its motion.  Additionally, the cases relied upon by the Government in support of its position are significantly distinguishable.

Turning first to Rule 26, in presenting its argument the Government references Rule 26(a)(e).  The court believes that the Government probably meant to cite to Rule 26(e)(2), which states:

> **(2) Expert Witness.**  For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  <u>Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due</u>.

Fed. R. Civ. P. 26(e)(2) (emphasis by underlining added).  Therefore, Rule 26(e)(2) ties timely expert updates to the deadline for a party to make its pretrial disclosures relating to trial.  As established under the court's Scheduling Order, "**final lists of trial witnesses and exhibits under Rule 26(a)(3)**" are due "**thirty days prior to trial**" for both sides.  (Doc. 9 § I.A.).[7]

Therefore, no "within thirty days of an expert deposition" requirement exists

---

[7] To the extent that the Report of Parties' Planning Meeting (Doc. 8) indicates a different deadline (Doc. 8 ¶ 3.h. ("Supplementation under Rule 26(e) due within thirty (30) days of obtaining knowledge of the discoverable information.")), the Scheduling Order did not incorporate that <u>proposed</u> due date and the Scheduling Order controls.

by virtue of Rule 26 or the  Scheduling Order.  Further, no time violation of the Scheduling Order has occurred, as the case has not been set for trial.  Accordingly, the Government has not shown any untimeliness in Plaintiffs' supplemental expert testimony.

As for case law relied upon by the Government, by way of an example the only binding authority cited, *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008), involved the identification of a plaintiff's expert only twelve days before the close of discovery and a submission of the corresponding Rule 26 report seven weeks <u>after</u> the end of the discovery period.  Therefore, a last minute disclosure of an expert witness coupled with an untimely submission of the expert report resulted in the Eleventh Circuit's decision to uphold the district court's order striking the expert affidavit.

This case is nothing like *Reese* and no such similar degree of delay warranting the exclusion of Plaintiffs' supplementary affidavits exists in this case.  Plaintiffs have timely identified their experts witnesses and submitted expert reports.  Therefore (and to the extent that the Government has even properly shown a Rule 26 time violation), the court is not persuaded that *Reese* appropriately applies to the record here.

Moreover, the Government does not take the position that Plaintiffs' supplemental reports include any new opinions or a material change in expert

15

testimony.  Therefore, the Government's reliance upon the ruling in *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 692-94 (1st Cir. 2000), involving the failure of counsel to disclose <u>a material change in</u> (versus an amplification of) an expert witness's opinion taking place shortly before trial, is similarly inapplicable.

Furthermore, Plaintiffs respond by directing the court to *Whatley v. Merit Distrib. Servs.*, 166 F. Supp. 2d 1350 (S.D. Ala. 2001), in which the district court explained, in rejecting the motion to strike:

> Further, even though the Defendants contend that the supplemental reports of Drs. Guenther and Herlihy are due to be stricken, <u>this Court disagrees and finds that the parties will not be unduly prejudiced by such supplemental opinions</u>.  This is true especially in light of the continuances of this matter, the way in which discovery has proceeded in this case, and due to the fact that Defendants have not only since had ample time to review these supplemental opinions but also because <u>Defendants have themselves filed detailed evidentiary motions to exclude, as to these experts regarding the admissibility of their testimony</u>.

*Whatley*, 166 F. Supp. 2d at 1356-57 (emphasis added).  Similarly, because the supplemental reports constitute a refinement of the statements previously made by Plaintiffs' experts and because they are offered in direct response to the Government's Rule 56 expert challenge (which rule expressly contemplates the filing of opposing affidavits),[8] the Government is unable to show unfair surprise or undue

---

[8]  As Rule 56(e) expressly states regarding opposing summary judgment:

prejudice as a result of Plaintiffs' _purported_ failure to timely provide any amended expert reports within thirty days from the witnesses' depositions.

### 2.   Affidavits by Other Medical Professionals

The Government also maintains that Rules 26 and 37 should prohibit the court from considering testimony from the affiants that Plaintiffs rely upon to defend against the Government's exclusionary challenge of their expert witnesses. Apparently, this is still an open question within the Eleventh Circuit. *See Nightlight Systems, Inc. v. Nitelites Franchise Systems, Inc.*, No. 1:04-CV-2112-CAP, 2007 WL 4563875, at *8 (N.D. Ga. May 11, 2007) ("The court is not aware of any Eleventh Circuit or Supreme Court case addressing the admissibility of an undisclosed expert witness who will be used solely at a *Daubert* hearing.").

The plain language of Rule 26 states regarding the disclosure of expert

---

**(2) Opposing Party's Obligation to Respond.** When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e) (emphasis by underlining added).

witnesses:

> **(A)** In General.  In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness <u>it may use at trial</u> to present evidence under Federal Rule of Evidence 702, 703, or 705.

Fed. R. Civ. P. 26(a)(2)(A) (emphasis added).  Similarly with respect to trial preparation and experts, Rule 26 draws a distinction between those experts who may present opinions at trial and those who have "been retained or specially employed by another party in anticipation of litigation or to prepare for trial" and are "not expected to be called[.]"  *Compare* Fed. R. Civ. P. 26(b)(4)(A) *with* Fed. R. Civ. P. 26(b)(4)(B).  With the former, depositions are permitted, but with the latter ordinarily discovering "facts known or opinions held" is not allowed.  *Id.*

The above affiants are not offered as trial witnesses for Plaintiffs; instead they are experts with opinions offered in response to the Government's *Daubert* challenge. Therefore, Rule 26 does not directly demand disclosure of them.

Although not completely on point, this court is guided in part by the opinion in *Nightlight Systems, supra*, in which the district court there reasoned:

> The rule dealing with the disclosure of expert witnesses, Federal Rule of Civil Procedure 26(a)(2), states that <u>a party must disclose the identity of any expert witness who may be used "at trial" to present expert evidence</u>. <u>It says nothing regarding the disclosure of an expert witness to be used at a *Daubert* hearing</u>. Local Rule 26.2(C), however, does not contain the limiting language "at trial." It states, "[a]ny party

18

who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert . . . ." <u>By not disclosing the identity of Dr. Bernhardt, therefore, the plaintiffs appear to have violated Local Rule 26.2(C), but arguably have not violated Federal Rule of Civil Procedure 26(a)(2)</u>.

The court is not aware of any Eleventh Circuit or Supreme Court case addressing the admissibility of an undisclosed expert witness who will be used solely at a *Daubert* hearing. The only court of appeals decision the court could locate regarding this issue was *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 739 (3d Cir.1994). In *Paoli*, the Third Circuit affirmed the district court's decision to allow an undisclosed expert to testify at a *Daubert* hearing. . . .

The court agrees with the Third Circuit's preference for the disclosure and deposition of expert witnesses before any *Daubert* hearing. <u>The disclosure of Dr. Bernhardt is also consistent with Local Rule 26.2(C)</u>. On the other hand, the court is aware of its obligation under *Daubert* to engage in a rigorous inquiry to determine whether Mr. Hollander is qualified, whether his methodology is sufficiently reliable, and whether his testimony will assist the trier of fact. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir.2005). <u>The court is also reluctant to exclude Dr. Bernhardt from testifying in the absence of any Eleventh Circuit case addressing this issue</u>.

Because the court's schedule does not allow the court to try this case until August and because of the dearth of Eleventh Circuit authority addressing this particular issue, <u>the court will allow Dr. Bernhardt to testify at the *Daubert* hearing, but not at trial</u>. As a precondition to allowing Dr. Bernhardt to testify at the hearing, the plaintiffs must serve an expert report or an affidavit stating Dr. Bernhardt's views on the defendants no later than 10 days from the date of this order.

2007 WL 4563875, at *8-9 (emphasis added).

Unlike the *Nighlight* case, no separate local rule exists within this particular

district on the disclosure of expert witnesses, much less one which calls for the disclosure of all (*i.e.*, trial and non-trial) expert witnesses. Therefore, this court is faced with a situation in which Plaintiffs have complied with the specific language of Rule 26 regarding experts and have not violated any related local rule. Under such circumstances and in the absence of any contrary controlling case authority, and given that no trial date has been set in this case, the court will not preclude Plaintiffs' non-trial affiants' expert testimony under Rule 26 offered in opposition to the Government's *Daubert*-based summary judgment motion.[9]

## B.    Motion for Summary Judgment

As grounds for summary judgment, the Government has challenged the sufficiency of Plaintiffs' four expert witnesses:  (1) Dr. Van Dam; (2) Dr. Ludwig; (3) Dr. Bolster; and (4) Dr. Adams.  The court addresses each witness in turn.

### 1.    Dr. Van Dam

Plaintiffs rely upon Dr. Van Dam's expert testimony to establish "the standard of care for Dr. Derrick Cho and the causes of Mr. Drake's injuries[.]"  (Doc. 54 at 31).  As summarized, Dr. Van Dam gives the following opinions:

[B]ased upon Dr. Van Dam's training, education, and experience as an

---

[9]  Because the court concludes that Plaintiffs have not violated the expert disclosure requirements of Rule 26, it does not reach any analysis under Rule 37 as to either portion of the Government's Motion to Exclude.

orthopaedic spine surgeon[,] . . . Dr. Cho breached the standard of care for spine surgeons on January 31, 2008 by failing to refer or transfer Mr. Drake to a facility capable of providing surgical care.  As a result of the delay in referring Eric Drake for surgical care to his large disk herniation with looming neurological consequences, Mr. Drake has suffered permanent neurological injury and deficits.

(Doc. 54 at 18 ¶ 12).

The Government maintains that Dr. Van Dam's causation testimony should be excluded because it is comparable to "the sooner, the better" theory that the Eleventh Circuit rejected in *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004).   The Government also argues that as an orthopedic surgeon, Dr. Van Dam is not qualified to testify on the standard of care applicable to Dr. Cho, a neurologist.  For the reasons explained below, the court rejects both of the Government's positions.

### a.  Causation

*McDowell* stands for the proposition that a "sooner, the better" expert theory of causation standing alone is insufficient under the *Daubert* standard.  In *McDowell*, the Eleventh Circuit explained:

> Mr. McDowell claims that the delay in treating his spinal epidural abscess caused or worsened his condition.  To support this, Dr. Merinkangas proposed that early treatment of a patient with spinal epidural abscess reduced neurological damage.   The district court labeled this theory as "the earlier, the better."   Additionally, Dr. Merinkangas also opined that the four-hour delay (on the part of the Grady defendants) caused Mr. McDowell's injuries.  Dr. Merinkangas based his theory on the common sense and "universal" axiom that

expedited treatment is preferable to delayed treatment.  Dr. Merinkangas also pointed to a study in SPINAL CORD COMPRESSION, which analyzed the effects of 48-hour delays in treatment.  <u>The district court determined that Merinkangas's theory lacked testing, peer review, a potential error rate, and general acceptance</u>.  We agree.

The district court was correct in finding that "the earlier, the better" theory was "too vague" to assist the trier the fact. Indeed, the notion of early treatment is well within common knowledge that would be obvious to the average juror, but has nothing to do with causation. Dr. Merinkangas himself stated that "the sooner, the better" is "just simply common understanding, and doesn't rise to the level where someone would bother reporting that because everyone knows that." <u>As such, this "the earlier, the better" theory adds nothing absent some testimony connecting the delay to the causation or aggravation of an injury</u>.

<u>We also agree with the district court's conclusion that Dr. Merinkangas's contention that McDowell's injury could have been prevented had he entered surgery four hours earlier failed the Daubert analysis</u>. Dr. Merinkangas could not identify any empirical data, survey, study, or literature to support his theory, <u>save the study in SPINAL CORD COMPRESSION, which dealt with a delay of 48 hours, which is more than twice the delay here</u>. Notwithstanding his lack of support, Dr. Merinkangas further opined that had McDowell been treated 24 hours earlier, then he would have no resulting paralysis. Taking either of Dr. Merinkangas's propositions (a four-hour delay or twenty-four delay), there is no support addressing anything less than a 48-hour delay. <u>There is a considerable gap between a 24-hour to a 48-hour delay, and even more so with a 4-hour delay. This runs afoul of <i>Allison</i> 's admonition that a theory should not "leap" from an accepted scientific premise to an unsupported one</u>. 184 F.3d at 1314. Furthermore, an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions, as we have here. <i>See General Electric v. Joiner</i>, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). This falls short of "general acceptance" prong of reliability.

22

*McDowell*, 392 F.3d at 1299-1300 (footnote omitted) (emphasis added).

The record relating to Dr. Van Dam's causation testimony is significantly more developed than that presented in *McDowell*.  As a result, the Government's emphasis upon *McDowell* is misplaced.  More particularly, Dr. Van Dam's testimony is substantiated by the five medical articles cited in the affidavits by Plaintiffs' causation experts that "CES should be treated as quickly as possible, preferably within 48 hours from the onset of symptoms, and that delay of treatment beyond 48 hours will result in significant permanent neurological injuries[.]"  (Doc. 54 at 26 (footnote omitted)).

Dr. Van Dam's causation testimony is further bolstered by the non-trial expert opinions of Drs. Keiller, Lanman, Ward, Tantuwaya, and Bingamom, who all agree "that it is the consensus of the medical community that CES is a known, recognized medical emergency, that the progression and effects of CES are well known in the medical community, that CES must be treated as quickly as possible, preferably within 24-48 hours of the onset of symptoms such as perineal numbness, and that permanent neurological injuries can result if treatment is delayed beyond 48 hours of the onset of symptoms or until after urinary retention has developed."  (Doc. 54 at 26).  These non-trial expert opinions are reinforced by another twenty medical publications, in addition to some of the same articles included in Plaintiffs' expert

23

affidavits.  (*Id.* at 27-28).

This is in sharp contrast to *McDowell*, in which only one supporting study was offered by the plaintiff and the scope of the report did not even address the particular period of delay in medical treatment at issue in the case (*i.e.*, the study addressed a time elapse of forty-eight hours, while the facts supported a smaller spread of time ranging from four to twenty-four hours).  Therefore, the plaintiff in *McDowell* had no supporting causal documentation for the length of delay in medical treatment that he experienced.

The  "leap" in logic from a generally accepted principle of a causal connection stemming from a forty-eight hour delay in treatment of  a spinal epidural abscess that was necessary in *McDowell* to substantiate the proferred expert testimony (that a four to twenty-four hour delay could result in similar neurological injuries) is not present in this case.  Further, as no comparable time differential exists in this instance between the delay in treatment that Mr. Drake received and the generally accepted principle of causation relating to an elapse in time of over forty-eight hours for CES patients, *McDowell*'s holding does not apply.

Additionally, *McDowell* does not stand for the proposition that all medical opinion testimony must be tested or subjected to peer review for it to be admissible under Fed. R. Evid. 702.  To the contrary of what the Government's Motion for

24

Summary Judgment seems to imply, *Daubert,* as well as other controlling cases, fully

acknowledge that <u>experience alone</u> can satisfy the reliability prong under certain

circumstances like those that are present in this case.  For example, as the Eleventh

Circuit unequivocally stated in *Frazier, supra*:

> In fact, the plain language of Rule 702 makes this clear: expert
> status may be based on "knowledge, skill, experience, training, or
> education." (emphasis added).  The Committee Note to the 2000
> Amendments of Rule 702 also explains that "<u>[n]othing in this
> amendment is intended to suggest that experience alone</u> . . . may not
> provide a sufficient foundation for expert testimony." Fed. R. Evid. 702
> advisory committee's note (2000 amends.).
>
> . . .
>
> To evaluate the reliability of scientific expert opinion, we consider, <u>to
> the extent practicable</u>:
>
> > (1) whether the expert's theory can be and has been tested;
> > (2) whether the theory has been subjected to peer review
> > and publication; (3) the known or potential rate of error of
> > the particular scientific technique; and (4) whether the
> > technique is generally accepted in the scientific
> > community.
>
> . . .
>
> Sometimes the specific [but non-exhaustive list of] *Daubert* factors will
> aid in determining reliability; sometimes other questions may be more
> useful.  As a result, "<u>the trial judge must have considerable leeway in
> deciding in a particular case how to go about determining whether
> particular expert testimony is reliable</u>." *Id.* at 152, 119 S. Ct. at 1176.
> Exactly how reliability is evaluated may vary from case to case, but
> what remains constant is the requirement that the trial judge evaluate the

reliability of the testimony before allowing its admission at trial. *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

*Frazier*, 387 F.3d at 1261-62 (emphasis added).   Accordingly and for all these reasons, the court is satisfied that Dr. Van Dam's testimony meets the *Daubert* standard as to relevancy <u>and</u> reliability.[10]

Furthermore, as the Supreme Court of Alabama has summarized submission of causation to a jury:

This Court has previously held that the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical

---

[10]   The court notes that the Government takes the position that because Plaintiffs are unable to satisfy any of the various *Daubert* factors concerning their experts, the testimony must be unreliable. (*See, e.g.*, Doc. 48 at 24-25, 26 ("Dr. Van Dam cannot satisfy any of the four *Daubert* factors or the five advisory committee note factors.")).   But as Plaintiffs respond (and *Frazier, supra*, reinforces), these factors establish a permissive framework for evaluating the admission of expert testimony, and satisfaction of them is not mandatory. (Doc. 54 at 29).   Moreover, the Government's blanket statement simply is not true.   In particular, no record of an "unjustifiable extrapolation from an accepted premise to an unfounded conclusion" (such as occurred in *McDowell*) exists in this case.   (Doc. 48 at 25).   Instead, a sufficient level of underlying documentation from outside sources, including multiple pieces of current medical literature and the opinions of other non-trial expert doctors, substantiates the significance of an over forty-eight hour delay for a CES patient such as Mr. Drake.   Accordingly, the "analytical gap between the data and the opinion proffered" is significantly smaller than the measure of "too great" which was the concern in *Joiner*. *Id.*, 522 U.S. at 146.

care. *Waddell v. Jordan*, 293 Ala. 256, 302 So.2d 74 (1974); *Murdoch v. Thomas*, 404 So.2d 580 (Ala.1981). <u>It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence</u>. *Waddell*; *see also* Annot., 54 A.L.R. 4th 10, § 3 (1987). . . .

We note that the aforementioned cases were decided upon the scintilla rule, which required only that the evidence produce a "glimmer or mere spark" of evidence to support the theory of liability. Alabama law now requires that the plaintiff produce "substantial evidence" of liability. Ala. Code 1975, § 12-21-12. In this case, we find such evidence. <u>While the facts do not establish that Mrs. Parker's cancer could have been prevented altogether if Dr. Collins had rendered a prompt diagnosis based on a clearer X-ray, medical testimony suggests that Mrs. Parker's condition worsened as a direct result of a diagnosis based upon a substandard X-ray</u>. That evidence was sufficient to create a jury question as to proximate cause in this case; accordingly, we reverse that portion of the judgment based on the directed verdict for Dr. Collins.

*Parker v. Collins*, 605 So.2d 824, 827(Ala. 1992) (emphasis added).[11]  Consistent with *Parker*, Mr. Drake has adduced reliable expert testimony by Dr. Van Dam from which a jury could reasonably conclude that his "condition worsened as a direct result of" the delay in his receiving surgical treatment for CES.

---

[11]  Therefore, under *Parker*, the standard for submitting causation to a jury under Alabama law does not so much require reliable proof that the plaintiff's complained condition could have been entirely prevented in the absence of any negligence, but rather reliable proof suggesting that the substandard medical services rendered resulted in a worsened condition.  Plaintiffs have met this standard.

### b.    Standard of Care

The Government maintains that as an orthopedic surgeon, Dr. Van Dam is unqualified to testify on the standard of care for Dr. Ortega, an internist, and Dr. Cho, a neurologist. (Doc. 48 at 26). Turning first to Dr. Ortega, because Plaintiffs are using Dr. Van Dam's testimony for the standard of care applicable to Dr. Cho only, that piece of the Government's Motion for Summary Judgment is **DENIED** as **MOOT**.

As for Dr. Cho, the Government mistakenly and materially misclassifies his status as a neurologist. (Doc. 48 at 26). Instead, it is undisputed that during the relevant time period Dr. Cho was still a neurosurgery resident practicing spine surgery. (Doc. 54 at 40).[12] Moreover, as Plaintiffs point out, the Supreme Court of Alabama has clarified that "an orthopedic spine surgeon [such as Dr. Van Dam] may testify to the standard of care for a non-board certified neurosurgeon practicing in spine surgery [such as Dr. Cho] because they are both trained in the same discipline or school of practice: spine surgery." (*Id.* (citing *Ronderos v. Rowell*, 868 So. 2d 422 (Ala. 2003)) (a medical malpractice case involving a doctor performing a thoracoscopic thoracic-diskectomy)).

---

[12] In its reply brief, the Government makes no attempt to dispute this statement, nor does it offer any counter to Plaintiffs' legal position cited in opposition.

The Supreme Court of Alabama explained why the expert specialist provision did not apply in *Rowell* as follows:

> Dr. Ronderos was not board-certified on the dates of Mr. Rowell's surgeries in this case. For that reason, Dr. Ronderos cannot be considered a specialist, within the meaning of § 6-5-548(c), at the time he allegedly breached the applicable standard of care in this case. Accordingly, the applicable subsection of § 6-5-548, Ala. Code 1975, in this case is subsection (b), which applies to health-care providers who are not specialists.

868 So. 2d at 427-28 (emphasis added). Similarly, Dr. Cho was not a specialist at the time of Mr. Drake's treatment. Accordingly, the competency of Dr. Van Dam's role as an expert witness is not governed by the more exacting requirements of Ala. Code § 6-5-548(c).

Moreover, Dr. Van Dam qualifies as a similarly situated health-care provider under § 6-5-548(b), and the Government has not adequately shown otherwise. Such a conclusion is not only consistent with the *Rowell* decision, but also with the testimony of the Government's neurosurgeon expert witness Dr. Eugene Quindlen, who testified that the standard of care for orthopaedic surgeons and neurosurgeons "doing lumbar surgery" is "pretty much the same." (Doc. 54 at 12 ¶ 18). Accordingly, for all these reasons, the Government's Motion for Summary Judgment relating to Dr. Van Dam's inability to testify regarding the standard of care applicable to Dr. Cho is **DENIED**.

### 2.    Dr. Ludwig

Plaintiffs rely upon Dr. Ludwig, a neurologist, for causation expert testimony relating to Dr. Ortega.  (Doc. 54 at 33 ("Neurologist Dr. Barry Ludwig has formed expert medical opinions regarding the causes of Mr. Drake's injuries[.]")).  Based upon his training, education, and experience, Dr. Ludwig's expert testimony in sum is:

> [T]hat the failure [of Dr. Ortega] to refer Mr. Drake to an emergency room or to arrange for emergent evaluation by a spine surgeon on January 31, 2008 and the two day delay in making such a referral, was the reason that Mr. Drake sustained the permanent injuries from caudal equina syndrome[.]

(Doc. 54 at 20 ¶ 15).

### a.    Causation

Like Dr. Van Dam, the Government objects to the expert testimony of Dr. Ludwig on the basis of *McDowell*'s rejection of the standing alone or naked "sooner, the better" theory of causation.  For the reasons explained above, the court has found that *McDowell* does not apply to the particular circumstances of this case.  Moreover, the court is satisfied that Dr. Ludwig's testimony meets the *Daubert* relevancy and reliability standard. Accordingly, summary judgment on that basis is **DENIED**.

### b.    Standard of Care

The Government challenges the qualifications of Dr. Ludwig to provide expert

testimony on the standard of care relating to Dr. Ortega, an internist.  (Doc. 48 at 27).

Because Plaintiffs to do not rely upon Dr. Ludwig's testimony for the standard of care

applicable to Dr. Ortega, that portion of the Government's Motion for Summary

Judgment is **DENIED** as **MOOT**.

The Government also disputes Dr. Ludwig's ability to provide standard of care

testimony relating to Dr. Cho.  (*Id.*).  Because Plaintiffs rely upon Dr. Ludwig's

testimony only to support causation applicable to Dr. Ortega, that portion of the

Government's Motion for Summary Judgment is similarly **DENIED** as **MOOT**.

### 3.    Dr. Bolster

Plaintiffs use Dr. Bolster, an internist, for standard of care testimony applicable

to Dr. Ortega.  (Doc. 54 at ("Internal medicine physician Dr. Eric Bolster has formed

expert medical opinions regarding the standard of care of Dr. Marco Ortega[.]")

(footnote omitted)).  In sum, Dr. Bolster gives the following opinions:

> [B]ased upon his training, education, and experience as an internal
> medicine specialist, . . . Dr. Ortega breached the standard of care for an
> internist on January 31, 2006 by failing to re-examine Mr. Drake, failing
> to recognize the symptoms of cauda equina syndrome, and failing to
> emergently refer Mr. Drake for an emergent neurosurgical evaluation.
> The appropriate standard of care would have required Dr. Ortega to
> re-examine Mr. Drake, recognize the symptoms of potential cauda
> equina syndrome, and then refer Mr. Drake for emergent neurosurgical
> evaluation when Mr. Drake presented on January 31, 2008 with acute
> signs and symptoms of spinal stenosis from an acute disc herniation with
> progressive neurological injury indicated by worsening pain, bilateral

leg paresthesias, weakness, and perineal peristhesias.

(Doc. 54 at 19 ¶ 13).

### a.    Causation

While the Government recognizes that Plaintiffs rely upon Dr. Bolster for standard of care testimony, it further states that "[t]o the extent any inference can be made that this opinion implicates Plaintiffs' causation theories, the opinions should be excluded as unreliable as shown with Plaintiffs' other experts on causation." (Doc. 48 at 28).  Because Plaintiffs only rely upon Dr. Bolster's testimony to support the standard of care, that portion of the Government's Motion for Summary Judgment is **DENIED** as **MOOT**.

### b.    Standard of Care

Citing generally to *McDowell*, the Government also challenges the adequacy of Dr. Bolster's standard of care testimony applicable to Dr. Ortega.  However, in *McDowell*,  the Eleventh Circuit did not exclude the expert witnesses' testimony on the basis of a lack of competency, but rather upon deficiencies regarding their causation testimony: "In accordance with Georgia law, we find the experts competent to render opinions as to the applicable standard of care for Wexford's nurses."  392 F.3d at 1297 (emphasis added).

Moreover, the Government does not contend that as an internist Dr. Bolster is

unqualified to testify regarding the standard of care for internists under any applicable Alabama law.  *See, e.g., McDowell*, 392 F.3d at 1296 ("The district court, did not, however, consider Georgia law in making its ruling.  In Georgia, a physician has been found to be competent to testify to the standard of care for licensed practical nurses.") (emphasis added).  For these reasons, the Government's Motion for Summary Judgment relating to Dr. Bolster's standard of care testimony relating to Dr. Ortega is **DENIED**.

### 4.    Dr. Adams

Finally, Plaintiffs rely upon Dr. Adams as a causation expert.  (Doc. 54 at 38 "Neurologist Dr. Robert Adams has formed expert medical opinions regarding the causes of Mr. Drake's injuries[.]")).  In short, Dr. Adams has formed the following opinions based upon his training, education, and experience as a neurologist:

> [T]hat had VA arranged for Mr. Drake to receive timely surgical decompression, when the perineal numbness was identified, but before it progressed to frank urinary incontinence, to a reasonable degree of medical probability, Mr. Drake would have averted the severe deficits, including lower extremity weakness, numbness and urinary dysfunction and also loss of sexual function from which he now suffers.

(Doc. 54 at 20-21 ¶ 16).

### a.    Causation

Relying upon *McDowell*, the Government objects to Dr. Adams's causation

33

testimony.  As explained in the foregoing analysis, the court has found that *McDowell* does not apply to the particular circumstances of this case.  Moreover, the court is persuaded that Dr. Adams's testimony satisfies the *Daubert* standard regarding relevancy and reliability.  Accordingly, summary judgment on that basis is **DENIED**.

## V.    CONCLUSION

Therefore for the reasons explained above, the Government's Motion to Exclude (Doc. 59) is **DENIED** and its Motion for Summary Judgment (Doc. 47) is also **DENIED**.  By separate order, this case will be set for a pretrial conference.

**DONE** and **ORDERED** this the 6th day of  February, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

34